UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| G.M. & M.C.M., on behalf of themselves and their minor sons, C.M. & D.M., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 14-4606 |
| v. | : | |
| BRIGANTINE PUBLIC SCHOOLS, | : | MEMORANDUM OPINION & ORDER |
| Defendants. | : | |

This matter is before the Court on Defendant Brigantine Public Schools' Motion to Dismiss [5]. The Court has reviewed the submissions of the parties and heard oral argument on the motion on April 21, 2015. For the reasons set forth below, the motion will be denied.

## Background

Plaintiffs G.M. and M.C.M. are the parents of a disabled ten-year old son, C.M., who was enrolled at the Brigantine Elementary School within the Defendant School District. Essentially, Plaintiffs allege that Defendant discriminatorily retaliated against Plaintiffs and their sons[1] for requesting that Defendant provide C.M. with a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 ("IDEA") and after (a) M.C.M. exercised her right to speak at public meetings of the Defendant's Board of Education and (b) Plaintiffs challenged the Board of Education in administrative legal proceedings. (Compl., ¶ 1.) Besides citing the IDEA, Plaintiffs assert violations of Section 504 of the Rehabilitation

---

[1] D.M. is C.M.'s eleven year-old brother who was a student at Brigantine Middle School during the relevant time period. (Compl., ¶ 9.)

1

Act, 29 U.S.C. § 791, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 ("ADA"), and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 ("NJLAD"). Plaintiffs contend, on the face of the Complaint, that they are not required to exhaust administrative remedies because they seek only compensatory damages and do not claim that the retaliation and discriminatory acts alleged had an adverse impact upon C.M.'s educational programming. (Compl., ¶ 4.) In an effort to comply with the applicable statutes of limitation, however, Plaintiffs simultaneously pursued claims in the New Jersey Office of Administrative Law. (Id.)

The facts as alleged in the Complaint are as follows. In October 2006, C.M. began attending Atlantic County Special Services School District ("ACSSSD") pursuant to an IEP written by Defendant. At the IEP meeting for this placement, and all subsequent IEP meetings, G.M. and M.C.M. requested that Defendant provide C.M. with a one-to-one aide for his pre-school programming. Defendant denied this request. (Compl., ¶ 13.)

In December 2006, C.M. dislocated his hip for the first time and was placed in a hip brace. (Compl., ¶ 14.) In May, 2010, then-Superintendent Dr. Robert Previti and District Child Study Team Supervisor Glick created a program within the Defendant District and invited C.M. to attend. G.M. and M.C.M. agreed, as C.M. had an approximately 90 minute bus ride to ACSSSD and had been in two bus accidents. (Compl., ¶ 15.) On May 6, 2011, C.M. underwent a procedure to correct his hip problem which required that he remain in a cast for eight weeks. (Compl., ¶ 16.) On January 14, 2012, C.M.'s hip again dislocated. M.C.M. made a request to Previti and Glick that the District provide C.M. a permanent one-to-one aide, given his tendency to suffer hip

dislocation. (Compl., ¶ 17.) In response, the District offered a one-to-one aide for four to six weeks, the time C.M. was expected to be in his brace. (Compl., ¶ 18.)

On February 2, 2012, the members of C.M.'s Individualized Education Program team (the "IEP Team") met to discuss C.M.'s IEP. Special Education Advocate Susan Coll-Guedes attended with M.C.M. (Compl., ¶ 19.) At that meeting, M.C.M. requested a permanent one-to-one aide, but that request was denied. (Compl., ¶ 20.) On March 1, 2012, M.C.M. submitted a letter from C.M.'s family physician stating that C.M. requires a permanent one-to-one aide for medical reasons. In response, Glick stated that the school would need its doctor to approve the one-to-one aide. (Compl., ¶ 21.) On March 7, 2012, Defendant approved a permanent one-to-one aide for C.M. M.C.M. expressed her concern to CST Supervisor Glick that the aide provided was not physically capable of performing the duties required. (Compl., ¶ 22.)

On March 8, 2012, C.M., while in Brigantine Elementary, again dislocated his hip. (Compl., ¶ 23.) On March 22, 2012, M.C.M. notified the IEP Team that she would not waive her right under federal law to have all of C.M.'s treating therapists attend his IEP meeting, scheduled for April 24, 2012. (Compl., ¶ 24-25.) At that IEP meeting, M.C.M. requested additional speech therapy, additional occupational therapy, and a continuous school year for C.M.; these requests were denied. (Compl., ¶ 25.) On May 10, 2012, M.C.M. submitted a letter from C.M.'s family physician and a behavioral specialist requesting that C.M. be enrolled in a continuous school year. (Compl., ¶ 26.)

On May 15, 2012, M.C.M. attended a Board of Education meeting, with C.M. She introduced herself and C.M. to the Board and noted that she was considering filing a due process complaint. At that meeting, she discussed in detail her concerns regarding the inappropriate educational programming her son was receiving and C.M.'s needs.

(Compl., ¶ 27.)  On June 10, 2012, M.C.M. and G.M. filed for a due process hearing, and submitted a letter to the BOE listing specific requests for C.M.  The due process complaint alleged that the Defendant District had failed to offer C.M. a FAPE.  (Compl., ¶ 28.)  On June 28, 2012, M.C.M. attended a Board meeting and provided Board members with a list of C.M.'s needs she hoped Defendant would address as a result of the due process filing.  Previti stated at a BOE meeting that he felt there would be a resolution of the dispute between Defendant and Plaintiffs.  (Compl., ¶ 29.)  On July 19, 2012, the parties convened a resolution meeting.  Defendant offered to enroll C.M. in a continuous school year and provide an additional 1/2-hour per week of speech and occupational therapy services. Defendant, however, refused to provide Applied Behavioral Analysis ("ABA") services.  Dissatisfied with this result, M.C.M. contacted the New Jersey Department of Education, requesting mediation for the purpose of securing additional services for C.M.  (Compl., ¶ 30.)

The last day of C.M.'s extended school year programming was July 20, 2012. (Compl., ¶ 37.)  On Friday, July 27, 2012, M.C.M. received a letter from the New Jersey Department of Education providing a mediation date.  On Monday, July 30, 2012 at 9 a.m., the New Jersey Department of Youth Family Services ("DYFS"), now called "Child Protection and Permanency," a division of the State of New Jersey's Department of Children and Families, responsible for investigating allegations of child abuse and neglect, received a telephone call which reported:

    a. C.M. had "cerebral palsy or something";

    b. C.M. and D.M. were so filthy that the complainant had to bathe them;

    c. C.M. had bloody and raw genitals;

    d. C.M. and D.M. were locked in their rooms by M.C.M. and G.M.;

4

  e. The family home was filthy; and

  f. C.M. and D.M. had rashes on their skin that appeared to be from bedbugs.

(Compl., ¶ 32.) Also on July 30, 2012, at about noon, M.C.M. received a telephone call from Child Study Team Supervisor Glick requesting a date on which C.M. could be provided an Occupational Therapy evaluation. (Compl., ¶ 34.)

  Two representatives from DYFS arrived at Plaintiffs' home at approximately 2:30 p.m. on July 30, 2012. (Compl., ¶ 35.) At the time of the DYFS visit, besides the family, a visiting adult, two visiting children and a speech therapist were present. M.C.M. was extremely upset. (Compl., ¶ 36.) During that visit, the DYFS representatives:

  (a) indicated that the caller who reported the family had stated that C.M. might have "cerebral palsy" or something. M.C.M. explained that C.M. has Down syndrome, is autistic, has a hip brace, exhibits behavioral issues, and wears diapers. The DYFS representative told M.C.M. that the caller had not informed DYFS of these facts;
  (b) observed M.C.M. changing C.M.'s diapers and reviewed his genitalia and skin condition, noting that there was nothing of concern;
  (c) inspected the entire house, excluding the third floor;
  (d) told M.C.M. that DYFS had received the call at 9 a.m. that day;
  (e) would not reveal the identity of the caller;
  (f) reviewed a letter related to the special education mediation presented by M.C.M.; and
  (g) remained in the home for approximately one and one-half hours.

(Compl. ¶ 36.) Within three days of the DYFS visit, CST Supervisor Glick telephoned M.C.M. stating that DYFS had requested records for C.M. and his siblings, stating: "I hope you don't think we would call them on you." (Compl., ¶ 38.)

  On August 16, 2012, the parties engaged in mediation. Defendant agreed to provide C.M. with ABA services and additional evaluations. (Compl., ¶ 39.) On the first day of school, DYFS returned to Plaintiffs' home for a second unannounced visit. The

5

DYFS representative spoke briefly to D.M.  M.C.M. expressed her concern that DYFS' presence would ruin the first day of school for her sons.  (Compl.,¶ 40.)

On October 8, 2012, C.M. was diagnosed with Celiac disease.  M.C.M. sent a letter to CST Supervisor Glick and Superintendent Previti notifying them of this diagnosis for C.M.  She requested that they make a gluten free diet available at school, but received no response.  (Compl., ¶ 42.)  On November 16, 2012, M.C.M. learned that Celiac disease can cause skin rashes that resemble bedbug bites, and notified DYFS.  (Compl., ¶ 44.)  On Wednesday, November 21, 2012, at approximately 8 p.m. on Thanksgiving eve, DYFS arrived for an unannounced third visit.  M.C.M. explained that C.M. had a new diagnosis of Celiac disease. (Compl., ¶ 45.)  On December 17, 2012, DYFS closed its case, finding no support for the accusations of abuse. (Compl., ¶ 46.)

On December 18, 2012, M.C.M. attended a meeting of the Board of Education to inquire about the hiring of Brigantine's new Superintendent.  She questioned why it was taking so long to find a permanent Superintendent.  The interim Superintendent, Dr. Previti, became irate with her and accused her of questioning his job performance. (Compl., ¶ 47.)

On January 18, 2013, C.M. again dislocated his hip while at school.  (Compl., ¶ 48.)  On Monday, February 4, 2013, the school nurse notified M.C.M. that C.M. had an ear infection. M.C.M. and the nurse discussed at length C.M.'s condition, including that she was treating his infection with drops, that he had ear tubes that may have been infected, and that persons with Down syndrome are more prone to ear infection than persons without Down syndrome because they have smaller ear canals in which fluid can build.  M.C.M. explained that she had scheduled a post-operative appointment with C.M.'s surgeon at the Children's Hospital of Philadelphia ("CHOP") for February 20,

2013, adding that she was treating the ear condition.  She stated that she did not wish to take C.M. to another doctor at that time and risk aggravating his hip injury.  (Compl., ¶ 49.)

On Tuesday, February 19, 2013, more than two weeks after M.C.M.'s February 4, 2013 conversation with the school nurse, but just one day before C.M.'s scheduled doctor visit at CHOP, DYFS received another call from the school.  The complainant noted C.M.'s ear infection and alleged that she detected an odor on C.M.  (Compl., ¶ 50.)  Later on February 19, 2013, a worker from DYFS arrived at the school.  When the DYFS employee arrived, she was asked to wait in conference room by the main office.  The school notified its school counselor, Ms. Christine Barron, to attend to the DYFS worker.  (Compl., ¶ 51.)  Ms. Barron informed the school Principal, Don Marrandino, that DYFS was there for C.M.  (Compl., ¶ 52.)  Ms. Barron requested that that the main office secretary call C.M.'s classroom to have him report to the office.  C.M. was then escorted by a one-to-one aide through the main office area of the elementary school.  (Compl., ¶ 53.)  Later on February 19, 2013, the District led the DYFS worker to the middle school to speak with D.M.  D.M. was called to the office to meet with the DYFS worker, who was there for approximately five minutes.  The DYFS worker questioned D.M. in a room with an open door, while two District employees remained just outside the room.  (Compl., ¶ 54.)

At approximately 2:30 p.m. on February 19, 2013, the DYFS worker visited M.C.M. at home.  M.C.M. was distraught and immediately asked "where are my kids?"  The DYFS worker explained that she had been called because C.M. had an ear infection.  M.C.M. explained C.M.'s vulnerability to such infections and that the school nurse, teacher and aide were well aware of this situation.  M.C.M. showed the DYFS employee

7

C.M.'s communication book, which had entries corroborating that school personnel knew that C.M. had an ENT appointment the following day. The DYFS representative would not provide a name, but did tell M.C.M. that someone from Brigantine School District had reported the family. After approximately an hour, the DYFS worker left. (Compl., ¶ 55.) On March 20, 2013, one month after the second phone call, DYFS again determined that the District's complaint was unfounded. (Compl., ¶ 56.)

On February 20, 2013, M.C.M. requested that C.M. be transferred to a county special services school. He has not since returned to Brigantine Elementary, and is currently enrolled in Atlantic County Special Services School District. (Compl., ¶ 57.) In October of 2013, C.M.'s speech therapist indicated that he had regressed and lost skills, probably due to environmental change. (Compl., ¶ 58.) Plaintiffs also allege that they have suffered severe emotional distress and mental anguish. (Compl., ¶¶ 59-63.)

On July 22, 2014, Plaintiffs filed the Complaint in this matter. Count I, brought pursuant to 42 U.S.C. § 1983, seeks compensatory and punitive damages for retaliation in violation of the First and Fourteenth Amendments by individual John Doe Defendants who reported G.M. and M.C.M. to DYFS with unfounded accusations of abuse or neglect and by others who acquiesced in this alleged retaliation or inadequately trained the Defendant's employees to refrain from making such retaliatory reports. Count II seeks compensatory damages from the Defendant School District for retaliation in violation of Section 504 of the Rehabilitation Act of 1973 and the ADA by Defendant's employees falsely reporting G.M. and M.C.M. to DYFS in retaliation for their advocacy on behalf of their child. Count III alleges that the Defendant District violated NJLAD by denying C.M. an education equivalent to that received by students without disabilities. Count IV alleges retaliation by the Defendant District in violation of the NJLAD. Count

8

V alleges that John Doe Defendants aided and abetted retaliation in violation of the NJLAD.  Count VI alleges that John Doe Defendants aided and abetted discrimination against C.M. in violation of the NJLAD.  Count VII alleges invasion of C.M.'s privacy by John Doe Defendants in that DYFS was compelled to inspect C.M.'s genitals by the false reports.  Count VIII alleges invasion of Plaintiffs' privacy by John Doe Defendants by placing Plaintiffs in a false light.

Defendant has brought a motion to dismiss the Complaint, arguing that Plaintiffs have not exhausted their administrative remedies as to the first six claims, and that Counts VII and VIII do not implicate the District.  Plaintiffs oppose the motion to dismiss and seek to amend their Complaint to indicate that they pursued an action in the New Jersey Office of Administrative Law and reached a settlement there on December 1, 2014.  Plaintiffs also argue that their NJLAD claims are not subject to the administrative exhaustion requirement.  In reply, Defendant argues that Plaintiffs' IDEA based claims have been rendered moot.

## **Standard**

A complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts, taken as true, fail to state a claim.  Fed. R. Civ. P. 12(b)(6).  When deciding a motion to dismiss pursuant to Rule 12(b)(6), ordinarily only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint, are taken into consideration.[2]  See Chester County Intermediate Unit v. Pa. Blue Shield, 896 F.2d 808,

---

[2] "Although a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (internal quotation marks and citations omitted) (emphasis deleted).

812 (3d Cir. 1990). It is not necessary for the plaintiff to plead evidence. <u>Bogosian v. Gulf Oil Corp.</u>, 561 F.2d 434, 446 (3d Cir. 1977). The question before the Court is not whether the plaintiff will ultimately prevail. <u>Watson v. Abington Twp.</u>, 478 F.3d 144, 150 (2007). Instead, the Court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility[3] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009) (citing <u>Twombly</u>, 550 U.S. at 556). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 556 U.S. at 680.

The Court need not accept "'unsupported conclusions and unwarranted inferences,'" <u>Baraka v. McGreevey</u>, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted), however, and "[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness." <u>Wyeth v. Ranbaxy Labs., Ltd.</u>, 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)); <u>see</u> <u>also</u> <u>Kanter v. Barella</u>, 489 F.3d 170, 177 (3d Cir. 2007) (quoting <u>Evancho v. Fisher</u>, 423 F.3d 347, 351 (3d Cir. 2005) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.")). <u>Accord</u> <u>Iqbal</u>, 556

---

[3] This plausibility standard requires more than a mere possibility that unlawful conduct has occurred. "When a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" <u>Id.</u>

U.S. at 679 (finding that pleadings that are no more than conclusions are not entitled to the assumption of truth).

Further, although "detailed factual allegations" are not necessary, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Twombly, 550 U.S. at 555 (internal citations omitted). See also Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Thus, a motion to dismiss should be granted unless the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." Twombly, 550 U.S. at 556 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## Analysis

Plaintiffs allege that the Defendant and its employees discriminated and retaliated against them for requesting that the Defendant provide C.M. with a FAPE under the IDEA. As such, Plaintiffs' claims are subject to the IDEA's administrative exhaustion requirement. See Batchelor v. Rose Tree Media Sch. Dist., 759 F.3d 266 (3d Cir. 2014) ("retaliation claims related to the enforcement of rights under the IDEA must be exhausted before a court may assert subject matter jurisdiction").

Plaintiffs have argued that they actually have exhausted their administrative remedies, and they seek to amend the Complaint solely to indicate such. They have

provided the Court with the OAL Decision Approving Settlement, dated December 1, 2014, which states:

> The parties have resolved all issues in controversy that are within the jurisdiction of the Office of Administrative Law.  The retaliation claims for violation of the First and Fourteenth Amendments, as enforced by 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12203 that petitioners raised seek remedies not available in the OAL.

Indeed, the Settlement Agreement itself, attached to the Decision, states:

> Petitioners consent to the dismissal of the above-captioned matter due to the Office of Administrative Law's lack of jurisdiction over the retaliation claims asserted in the Petition, without prejudice to Petitioner's retaliation claims asserted in the United States District Court for the District of New Jersey, docketed at No. 14-cv-04606-JHR-JS.

Therefore, the motion to dismiss for failure to exhaust administrative remedies must be denied.

Further, insofar as Defendant requests dismissal of Counts VII and VIII because they do not implicate the District, the Court notes that Plaintiffs named John Doe(s) and/or Jane Doe(s), therefore dismissal of the entirety of these Counts is not appropriate at this stage of the litigation.

For these reasons, as well as those expressed on the record during oral argument,

IT IS ORDERED this 8th day of June, 2015 that Defendant Brigantine Public Schools' Motion to Dismiss [5] is hereby DENIED.

                                   s/ Joseph H. Rodriguez
                                   JOSEPH H. RODRIGUEZ
                                   U.S.D.J.